NA IWI O NA KUPUNA O MOKAPU, Heleloa, UlupaʻU A Me KuwaʻAʻOhe, by and through their guardians, Hui Malama I Na Kupuna O Hawaiʻi Nei, a Hawaiʻi nonprofit corporation, Plaintiffs,

v.

John DALTON, in his capacity as the Secretary of the Department of the Navy and Bernice Pauahi Bishop Museum, a Hawaiʻi corporation, Defendants.

Civ. No. 94–00445 DAE.

United States District Court,
D.Hawaiʻi.

July 25, 1995.

Paul F.N. Lucas, Native Hawaiian Legal Corporation, Honolulu, HI, for Na Iwi O Na Kupuna O Mokapu, Heleloa, UlupaʻU A Me KuwaʻAʻOhe.

Theodore G. Meeker, United States Attorneys Office, Honolulu, HI, Daria J. Zane, Environmental & Nat Resources Div., U.S. Dept. of Justice, Washington, DC, for John Dalton.

Alexander Marrack, Kelvin H. Kaneshiro, Gilbert D. Butson, Arthur B. Reinwald, Reinwald O'Connor Marrack Hoskins & Playdon, Honolulu, HI, for Bernice Pauahi Bishop Museum.

### ORDER GRANTING FEDERAL DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF HUI MALAMA'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

DAVID ALAN EZRA, District Judge.

This court heard the parties' motions on July 10, 1995. Paul F.N. Lucas, Esq., and Alan T. Murakami, Esq., appeared on behalf of Plaintiff Hui Malama I Na Kupuna O Hawaiʻi Nei (hereinafter "Hui Malama"); Daria J. Zane, Attorney for the Department of Justice General Litigation Section, Environment and Natural Resources Division, and Theodore G. Meeker, Assistant United States Attorney, appeared on behalf of the Federal Defendant John Dalton (hereinafter "the Federal Defendant"). After hearing argument and reviewing the motions and the supporting and opposing memoranda, the court GRANTS the Federal Defendant's Motions for Summary Judgment, and DENIES Plaintiff Hui Malama's Cross–Motion for Partial Summary Judgment regarding Count II of the Complaint.

### BACKGROUND

Congress enacted the Native American Graves Protection and Repatriation Act ("NAGPRA") on November 16, 1990. On March 25, 1992, the Federal Defendant awarded a contract to the Bishop Museum to prepare an inventory of the human remains disinterred from the Mokapu Peninsula (hereinafter "the Mokapu remains" or "the Na Iwi") in compliance with NAGPRA Section 3003. This was the first Department of Defense project falling under NAGPRA.

At the time the contract was awarded, there were no federal regulations or guidelines for preparing an inventory under NAGPRA. The proposed implementing regulations relating to NAGPRA were not issued until May 28, 1993, and as of this date are still not finalized. The Department of the Interior did not provide inventory guidelines and examples until March 1995.

The Mokapu remains represented the largest single group of Native Hawaiian remains housed at the Bishop Museum at the time of the inventory. The general objective of the Mokapu inventory was to provide an accurate list of the human remains and funerary objects from the Mokapu Peninsula, and to establish a minimum number of individuals represented by the remains. The enumeration of individuals was effectively to be a census, with morphometric and macroscopic assessments of sex, age, and distinguishing characteristics noted as aids to compare with the limited information contained in the previously prepared Osteology Catalog.[1]

Because several different research scholars, curators, and other staff listed the remains, the descriptions in the Osteology Catalog relating to sex, age, distinguishing physical attributes and pathological observations varied. Review of such data revealed a significant number of discrepancies between

---

1. The Osteology Catalog is a book that contains    information regarding the human remains.

the accessions described as one individual and the remains actually present.[2]

The lack of a systematic curatorial program left the Mokapu collection in some disarray. At the commencement of the inventory, there was some confusion of skeletal parts within the collection of remains. The actual minimum number of individuals represented was not determinable based on the existing data. In addition, there was extensive commingling of remains within accessions. That is, though an accession listed only one individual, more than one individual was in fact often present.

As a result of the commingling and discrepancies between the remains and the records relating to them, the data contained in the Osteology Catalog could not be used to conduct a proper inventory. It became necessary to examine the Mokapu remains using standard physical anthropology techniques. The inventory report indicates that Bishop Museum employed such techniques. The museum performed no DNA analyses, nor did the museum conduct extensive metric or nonmetric analyses of the remains.[3]

During the inventory process, pursuant to Section 3003(b)(1)(A) of NAGPRA, consultations were held with, *inter alia*, Hui Malama. Formal meetings were held on March 25, 1992, January 13, 1993, and February 27, 1993. Telephone consultations also occurred periodically.

Among the issues specifically discussed during these consultations were the difficulties encountered by Bishop Museum. Bishop Museum advised Hui Malama that it intended to use current anthropological methods of determining age and sex to obtain a more accurate enumeration of individuals.

At the January 13, 1993 meeting, representatives of the Federal Defendant made presentations regarding the methodologies Bishop Museum was using in conducting the inventory and the status of the project. The Federal Defendant's representatives reported the preliminary results of the physical anthropological examinations relating to age, sex, skeletal completeness and recorded pathologies.

At the next meeting on February 27, 1993, the parties specifically discussed the discrepancies discovered in the curatorial records versus the actual remains and the problems associated with separation and commingling of the remains. Topics discussed included skeletal completeness, skeletal alteration, determinations of ethnicity, sex, and age, pathologies, and metric determinations.

Bishop Museum finalized the inventory, consisting of the narrative report and appendices, in January 1994. The Secretary of the Interior published the notice of completion in the Federal Register in accordance with NAGPRA. *See* 25 U.S.C. § 3003(d)(3). Potential claimants received copies of the inventory upon request. Distribution of the inventory to date has been limited primarily to: (1) claimants; (2) persons involved in this litigation; (3) Navy personnel; (4) the Review Committee and National Park Service Consulting Archaeologist pursuant to NAGPRA requirements; and (5) requestors under the Freedom of Information Act, 5 U.S.C. § 552. The inventory has not yet been published.

On June 14, 1994, Hui Malama brought suit against the Federal Defendant and the Bishop Museum for declaratory and injunctive relief.[4] The complaint alleged: (Count I)—that the Federal Defendant failed to re-

---

2. Accession documents contain information on the method of acquisition, the date the items were received, the date they were collected, the locality from which they were collected, the donor name and address, and other pertinent information.

3. Only in the case of four sets of remains did Bishop Museum perform more extensive metric and nonmetric analyses. This was allegedly done only because, on preliminary examination, there was a definite question as to cultural affiliation/ethnicity of the remains.

4. Pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure, the parties stipulated on January 27, 1995, to dismiss with prejudice Defendant Bishop Museum from the present action, as a result of Bishop Museum transferring all drafts and final copies of the subject inventory to the Federal Defendant and deleting any and all drafts of the inventory from its computers.

For the purpose of the present disposition, reference to "the Federal Defendant" will hereinafter incorporate actions taken by Bishop Museum as well as the Federal Defendant.

turn expeditiously the Mokapu remains in violation of NAGPRA Sections 3005 and 3010; and (Count II)—that the Federal Defendant conducted additional scientific research on the Mokapu remains in derogation of alleged agreements between the Federal Defendant and Hui Malama and in violation of NAGPRA Sections 3003 and 3010. Complaint at 6–9.

Hui Malama's original Complaint prayed that the court: (1) declare that the Federal Defendant violated NAGPRA Section 3005 by failing to return expeditiously the Mokapu remains; (2) declare that the Federal Defendant violated NAGPRA Section 3003 by undertaking additional research on the Mokapu remains; (3) order that the results of the additional research be deleted from all published inventory reports; (4) order that the research information be placed under seal, subject to disclosure only upon the express written approval of Hui Malama; (5) order the expeditious return of the Mokapu remains to Hui Malama; and (6) grant Hui Malama its costs and attorney fees. *Id.* at 9–10.

The Federal Defendant filed its first Motion for Summary Judgment on January 27, 1995 (hereinafter "Federal Defendant's January Motion for Summary Judgment") regarding both Counts I and II of Hui Malama's Complaint. Hui Malama subsequently withdrew Count I regarding the request for immediate repatriation to Hui Malama. *See* discussion infra part I. Following settlement negotiations during Spring 1995, the Federal Defendant filed a second Motion for Summary Judgment on May 11, 1995 (hereinafter "Federal Defendant's May Motion for Summary Judgment"), addressing only the additional scientific research issue contained in Count II. Hui Malama also filed a Cross-Motion for Partial Summary Judgment on May 11, 1995, seeking summary judgment on Count II.

### STANDARD OF REVIEW

■ Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party has the initial burden of "identifying for the court those portions of the materials on file in the case that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *State Farm Fire & Casualty Co. v. Martin,* 872 F.2d 319, 320 (9th Cir.1989).

■ Once the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec.,* 809 F.2d at 630; Fed.R.Civ.P. 56(e). The opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *Intel Corp. v. Hartford Accident & Indemnity Co.,* 952 F.2d 1551, 1558 (9th Cir.1991). The nonmoving party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *T.W. Elec.,* 809 F.2d at 630; *Blue Ocean Preservation Soc. v. Watkins,* 754 F.Supp. 1450, 1455 (D.Haw.1991); Fed.R.Civ.P. 56(e). If the nonmoving party fails to assert specific facts, beyond the mere allegations or denials in its response, summary judgment, if appropriate, shall be entered. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *T.W. Elec.,* 809 F.2d at 630; Fed.R.Civ.P. 56(e). There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Citadel Holding Corp. v. Roven,* 26 F.3d 960, 964 (9th Cir.1994); *Blue Ocean,* 754 F.Supp. at 1455.

■ In considering a motion for summary judgment, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on

that evidence." *T.W. Elec.*, 809 F.2d at 631 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Inferences must be drawn in favor of the nonmoving party. *T.W. Elec.*, 809 F.2d at 631. However, when the opposing party offers no direct evidence of a material fact, inferences may be drawn only if they are reasonable in light of the other undisputed background or contextual facts and if they are permissible under the governing substantive law. *Id.* at 631–32. If the factual context makes the opposing party's claim implausible, that party must come forward with more persuasive evidence than otherwise necessary to show there is a genuine issue for trial. *Bator v. State of Hawaii,* 39 F.3d 1021, 1026 (9th Cir.1994) (citing *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988)).

## DISCUSSION

I.  Federal Defendant's January Motion for Summary Judgment on Count I: Failure to Return Mokapu Remains to Hui Malama

Hui Malama's original Complaint alleged that the Federal Defendant violated NAGPRA Section 3005 by failing to return expeditiously the Mokapu remains to Hui Malama once cultural affiliation was known. Complaint at 6–8. At the time Hui Malama filed the Complaint the organization believed itself to be the only group requesting repatriation of the remains. Hui Malama withdrew Count I after learning that fourteen other groups also made claims to the remains. Hui Malama thus concedes that it is no longer seeking adjudication of its repatriation claim pending the Federal Defendant's decision regarding which group is entitled to receive the Mokapu remains. Hui Malama's concession effectively renders Count I of the Complaint and the issues relating to it moot. However, Hui Malama has not formally withdrawn Count I as set forth in the original Complaint. Because the Federal Defendant has moved this court for summary judgment on Count I and Hui Malama has responded to the motion, and because this issue is likely to arise again, the court here addresses the questions relating to repatriation.

■ Hui Malama contends that in the context of a repatriation dispute, the Federal Defendant would adequately represent the interests of any claimant to the remains not joined with Hui Malama. This argument fails. In no way can the Federal Defendant be considered an adequate representative of other claimants' interests in this context. The myriad differences in the parties' respective motivations and concerns with respect to the issues in this case makes consideration of the Federal Defendant and Native Hawaiian groups as parties with common interests untenable. The other claimants are indispensable parties who must be joined before a repatriation claim may proceed.

■ Regarding the Federal Defendant's exhaustion and ripeness arguments, Hui Malama suggests that if a repatriation claim was still at issue, exhaustion of administrative remedies would not be required for the claim to be ripe. According to Hui Malama, the fact that NAGPRA contains a savings clause and an enforcement provision giving district courts jurisdiction of suits brought under NAGPRA indicates that there is no exhaustion requirement. *See* 25 U.S.C. §§ 3009, 3013. However, NAGPRA clearly provides for an administrative process under which the agency will decide to whom remains should be repatriated. *See* 25 U.S.C. § 3005. To date, the Federal Defendant has not made a decision on repatriation of the Mokapu remains. Until the Federal Defendant repatriates the Mokapu remains in accordance with NAGPRA provisions, there is no final agency action to challenge.[5] Judicial intervention prior to the agency's decision would disrupt the agency process and result in a waste of judicial resources. This is precisely the type of administrative decision

---

**5.** If a party were to make a colorable claim that a federal agency or museum was not properly following NAGPRA repatriation procedures and was thereby causing undue delay, judicial intervention might be warranted in the absence of final agency action. However, there is no present objection by Hui Malama that the current repatriation process violates NAGPRA procedural mandates.

to which exhaustion requirements and the ripeness doctrine are intended to apply. Hui Malama's challenge to the repatriation process as contained in Count I of the Complaint is therefore not appropriately before this court.

For these reasons, the court GRANTS the Federal Defendant's January Motion for Summary Judgment on Count I of the Complaint alleging failure to return the Mokapu remains to Hui Malama in violation of NAGPRA Section 3005.[6]

## II. Standing Issues

### A. *Standing; Human Remains*

The Complaint filed on June 14, 1994 lists the Na Iwi, or the Mokapu remains, as Plaintiffs. The Na Iwi purportedly brought this action by and through their alleged guardian, the Native Hawaiian organization Hui Malama. Consistent reference to "Plaintiffs Na Iwi" in the Complaint as well as Hui Malama's Memorandum in Opposition to Defendant's January Motion for Summary Judgment make it clear that the Mokapu remains were intended as Plaintiffs in their own right. Hui Malama asserts that according to Hawaiian custom, human remains are spiritual beings that possess all of the traits of a living person. The Federal Defendant's physical examination of the remains was, they contend, a violation and desecration of the remains. As a result, the remains have allegedly suffered an injury to their spiritual well-being and have standing to bring suit.

▄▄ However, as the Federal Defendant correctly contends, neither the provisions of

NAGPRA nor the common law afford standing to the Mokapu remains. Human remains are explicitly classified as "cultural items" under NAGPRA. *See* 25 U.S.C. § 3001(3). NAGPRA simultaneously fails to list human remains as legally-recognized "persons" or as an entity with a legally-protected interest under the statute. *See* 25 U.S.C. §§ 3001–3013; 43 C.F.R. § 7.3 (1993). Because Congress omitted human remains from all NAGPRA provisions concerning statutory participants and their rights, fundamental tenets of statutory construction dictate that the court assume Congress did not consider human remains as having a legally-protected interest under the Act. *See West Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc.*, 846 F.2d 1239, 1244 (9th Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). The provisions of NAGPRA do not grant the Mokapu remains standing to sue under the Act.

No court has addressed the issue of whether human remains have legal standing at common law. Hui Malama cites several cases where federal courts have apparently permitted non-human entities, such as animals and natural habitats, to bring suit, and attempts to draw an analogy with the human remains.[7] None of the cases Hui Malama cites, however, contains any indication that the parties or the court challenged the standing of the non-human plaintiffs. This court has previously denied standing to a non-human plaintiff where the opposing party timely objected. *See Hawaiian Crow v. Manuel Lujan, Jr.*, Civ. No. 91–00191 (D.Ha-

---

**6.** Count I contained two additional allegations: (1) that the Bishop Museum failed to repatriate the Mokapu remains in good faith in derogation of NAGPRA Section 3005(f); and (2) that the Federal Defendant violated an alleged fiduciary obligation to Hui Malama in derogation of NAGPRA Section 3010. *See* Complaint at 8.

Hui Malama formally withdrew its lack of good faith allegation against the Bishop Museum when it stipulated to dismiss the Bishop Museum from the suit, thereby eliminating the need for this court's determination of that issue. *See* supra note 4. However Hui Malama only informally withdrew the violation of fiduciary duty allegation against the Federal Defendant in the repatriation context. The court's present disposition of the Federal Defendant's January Motion

for Summary Judgment regarding Count I therefore formally disposes of the violation of fiduciary duty allegation.

The court more thoroughly addresses the Federal Defendant's obligations under NAGPRA Section 3010 in its discussion of Count II. *See* infra note 12.

**7.** *See, e.g., Palila v. Hawaii DLNR*, 852 F.2d 1106, 1107 (9th Cir.1988) (acknowledging that the endangered palila bird "has legal status and wings its way into federal court as a plaintiff in its own right"); *Mount Graham Red Squirrel v. Yeutter*, 930 F.2d 703 (9th Cir.1991) (recognizing a squirrel's status as plaintiff); *Sun Enterprises, Ltd. v. Train*, 532 F.2d 280 (2d Cir.1976) (recognizing an ecosystem's plaintiff status).

waii Sept. 13, 1991). Furthermore, all of the cases cited by Hui Malama involved more than one named plaintiff, supporting the inference that at least one of the other named plaintiffs had proper legal standing. These cases leave the legal status of non-human entities for standing purposes in doubt.

■ The court finds no sound legal basis for granting standing to human remains. Even the cases cited by Hui Malama refer to living organisms or dynamic ecosystems that are generally recognized as capable of suffering real injury in terms of physical or demonstrable detriment. Objects or entities without any attributes of life in the observable or provable sense are generally not afforded a legally-protected interest for standing purposes.

The court notes that inanimate entities such as ships and corporations are accorded standing in their own right, but these forms of standing are legal fictions created for the benefit of living members of society. Allowing these entities to act as parties to lawsuits facilitates business and commerce, which in turn furthers societal interests and benefits individual persons. Hui Malama has not shown that a comparable identifiable benefit to living members of society would result from affording human remains standing. Even Justice Douglas' dissenting opinion in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), one of the most creative treatments of the subject, supports only the idea that inanimate entities should be granted legal status for standing when they act as surrogates for the interests of living things:

> The river, for example, is the living symbol of all the life it sustains or nourishes—fish, aquatic insects, water ouzels, otter, fisher, deer, elk, bear, and all other animals, including man, who are dependant on it or who enjoy it for its sight, its sound, or its life. The river as plaintiff speaks for the ecological unit of life that is part of it.

*Sierra Club,* 405 U.S. at 743, 92 S.Ct. at 1370 (Douglas, J. dissenting). In sum, it is un-

clear whether this court could even reach the issue of the remains' eligibility for legal standing.

■ The court need not further consider the remains' eligibility for standing, however, because the court finds that the Mokapu remains have not met common law standing requirements. A plaintiff must meet three requirements to have standing: (1) the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest; (2) there must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Valley Forge College v. Americans United,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

■ There is no evidence that the remains have suffered an "injury in fact."[8] NAGPRA's designation of human remains as "items" and not as persons with legally-protected rights or as an entity with a legal personality precludes this court from contravening Congress' obvious intent to deny human remains an interest susceptible to injury in the legal sense. Even if this court could ignore the clear legislative mandate and permit a showing that the remains have suffered some injury, Hui Malama's unsubstantiated assertions would not suffice to show that the remains did in fact suffer an injury. The Mokapu remains have not suffered a legally cognizable injury.

Further, even if the court recognized the Mokapu remains as having suffered some legally cognizable injury, Hui Malama has shown no causal connection between any injury and actions taken by the Federal Defendant. The record demonstrates that the Federal Defendant has attempted to conform its actions to its perceived obligations under NAGPRA regarding proper treatment and repatriation of the human remains in its care.

---

**8.** The court notes its discomfort with applying the conventional concept of "injury" in an area of such deeply-held belief. However, the fact that a specific statutory scheme now exists for the protection of the interests at issue here makes the decision whether to expand the concept of "injury" to represent more diverse perspectives unnecessary in this case.

Hui Malama has presented no evidence showing that the Federal Defendant either intentionally or incidentally caused any harm to the well-being of the Mokapu remains. Hui Malama's failure to demonstrate any traceable relationship between the Federal Defendant's actions and any alleged injury suffered by the Mokapu remains precludes the court from granting standing to the Mokapu remains.

■ A practical concern further cautions this court against granting standing to the Mokapu remains. Granting standing would necessitate a guardian to accomplish the tasks involved with litigation. NAGPRA does not contemplate any kind of guardianship regarding the disposition of claims or disputes concerning human remains. Although NAGPRA does mention Hui Malama in its definitional section as an organization providing guidance and expertise in decisions regarding Native Hawaiian cultural issues, *see* 25 U.S.C. § 3001(6), Congress did not clearly confer guardian status upon Hui Malama by this reference.

■ Hui Malama argues that, under Hawaiian law, the government is obligated to protect all rights "customarily and traditionally exercised" by Native Hawaiians, and therefore this court should recognize the Hawaiian concept of spiritual guardianship. The underlying argument is not entirely without merit. *See Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247, 1271 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993); H.R.S. § 1–1. However, as the court does not recognize the Mokapu remains' standing to bring suit, discussion about any kind of guardianship—legal, spiritual, or otherwise—is moot. Moreover, even if the court granted standing to the remains, nowhere does Hawaiian law acknowledge Hui Malama as the sole guardian for all Native Hawaiian human remains. Where claims among several Native Hawaiian groups may conflict, equity would require that all the groups serve jointly as guardian of the human remains for the purpose of negotiating or litigating on the remains behalf prior to proper repatriation.

According to the foregoing analysis, Congress did not confer statutory standing upon human remains under NAGPRA, and the Mokapu remains do not satisfy common law standing requirements. The court finds that the Mokapu remains do not have standing to sue and are not plaintiffs in this action. Further, even were the remains to have standing, neither NAGPRA nor Hawaiian law legally confers guardian status solely upon Hui Malama. Hui Malama's participation in that capacity for any reason would be improper without joining as co-guardians all other parties whose rights and interests may be affected.

B. *Standing; Hui Malama*

■ As the Mokapu remains do not have standing to bring suit, Hui Malama must satisfy standing requirements in its own right for the suit to survive. Although the Federal Defendant concedes that Hui Malama has proper standing relating to Count II of the Complaint, this court must satisfy itself that Hui Malama has legal standing before it can properly recognize Hui Malama as Plaintiff.

■ Hui Malama contends that NAGPRA itself grants Hui Malama standing under two provisions. First, Hui Malama asserts that its inclusion in the definitional section of the statute effectively grants the organization standing. *See* 25 U.S.C. § 3001(6). While NAGPRA recognizes Hui Malama as a party with an interest in Native Hawaiian matters generally, the court does not construe this recognition as conferring standing. Absent an express provision granting standing to Hui Malama, the court cannot infer that Congress intended to do so. The conspicuous absence in the legislative history of any indication that Congress intended to grant standing to Hui Malama under the statute furthers the inference that there was no such intention. The court construes Congress' mention of Hui Malama in the definitional section as providing an intended source of information that parties working under the provisions of NAGPRA may consult in order to better facilitate the statute's goal, namely proper repatriation of Native Hawaiian cultural items. The words of the statute convey nothing more.

Hui Malama also contends that NAGPRA provides it standing under Section 3013. Section 3013 reads in pertinent part: "The United States district courts shall have jurisdiction over any action brought by *any person* alleging a violation of this chapter...." 25 U.S.C. § 3013 (emphasis added). Hui Malama argues that as a corporation it qualifies as a "person" and may sue on behalf of its injured members. *See, e.g., Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The court agrees with this construction. If Hui Malama satisfies settled constitutional organizational standing requirements, Hui Malama may qualify as a "person" entitled to sue under NAGPRA.

For an association or organization to have standing to bring suit on behalf of its members, three requirements must be met: (1) the association's members must otherwise have standing to sue in their own right; (2) the interests the members would seek to protect must be germane to the association's purpose; and (3) the claims asserted or the relief requested must require the participation of individual association members in the lawsuit. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. Hui Malama satisfies all three requirements.

First, as conceded by the Federal Defendant, members of Hui Malama have allegedly been personally injured by the Federal Defendant's actions in a sense sufficient to satisfy standing requirements. Through declarations of its members, Hui Malama has alleged actual injury to particular members of the organization, which the Federal Defendant allegedly caused and which this court has the power to redress.[9] As such Hui Malama members have demonstrated sufficient injury in fact to confer individual standing and satisfy the first part of the *Hunt* test.

Second, efforts by Hui Malama members to expunge the results of the physical examination are consistent with Hui Malama's purpose. According to Hui Malama members, the organization's function is to care for and protect Native Hawaiian remains. *See* Declarations of Edward Halealoha Ayau at 3–4, Kunani Nihipali at 4, and Pualani Kanahele at 2–3. NAGPRA states that Hui Malama's main function is to provide guidance and expertise in decisions dealing with Native Hawaiian cultural issues, particularly burial issues. *See* 25 U.S.C. § 3001(6). Hui Malama members view the interest they currently seek to protect as consistent with both the self-styled and statutorily-defined purposes of Hui Malama. In the context of this case, the court agrees. The organization's central function as described in the declarations does not deviate significantly from the one enumerated in NAGPRA. The declarations therefore provide sufficient evidence that the interest in expunging the information contained in the inventory report is germane to Hui Malama's purpose.

Finally, members of Hui Malama who have allegedly suffered emotional, spiritual, and physical harm as a result of the inventory report's publication must participate in the litigation to satisfactorily adjudicate the issue. Through submission of declarations to help the court understand the issues and abate any perceived harm, the participation of individual Hui Malama members is indispensable.

As all three requirements of *Hunt* are satisfied, the court finds that Hui Malama has standing to act as Plaintiff in this suit. Rule 17(a) provides that "[n]o action shall be dismissed ... until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." Fed.R.Civ.P. 17(a). For the purposes of this

9. Hui Malama members Edward Halealoha Ayau, Kunani Nihipali, and Pualani Kanahele describe the alleged harm suffered by Hui Malama members in their declarations. They allege both physical and spiritual harm. By accepting a sacred covenant under Hawaiian tradition and custom to care for the disinterred remains, harm will allegedly befall members who fail to protect and care for or who permit the desecration of the remains. Members allege they also suffer emotional trauma as a result of publication of the inventory report, and fear for the physical and spiritual safety of themselves and their families. The court respects these personal beliefs.

disposition, the court hereby substitutes Hui Malama as Plaintiff *sua sponte*.[10]

III. Count II: Additional Scientific Research in Violation of NAGPRA Sections 3003 and 3010

■■■■ Count II of the Complaint alleges that the Federal Defendant, without informing Hui Malama and in derogation of agreements by Defendant in consultation with Hui Malama,[11] undertook additional scientific research on the Mokapu remains, and prepared a report concerning the results of the research, in violation of NAGPRA Sections 3003 and 3010.[12] Complaint at 8–9.

As set forth below, the Freedom of Information Act ("FOIA") controls the resolution of Count II.[13] In accordance with FOIA, and consistent with NAGPRA, the court DE-

NIES Hui Malama's requests to: (1) delete and place under seal certain information contained in the Mokapu inventory; (2) declare that the Federal Defendant violated NAGPRA Section 3003 by its examination of the Mokapu remains; and (3) grant Hui Malama its attorney fees and costs.

A. *FOIA Mandates Disclosure of Complete Inventory*

■■■ The Freedom of Information Act mandates the disclosure of information controlled by the federal government. FOIA "reflect[s] 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S.Ct. 471, 475,

---

**10.** Hui Malama argues that because it seeks only to expunge inventory information and does not seek repatriation, its claims do not affect the rights of the other claimants. It therefore contends that joinder of the other claimants as co-plaintiffs is not required. This argument misses the mark. Hui Malama has not shown unanimity on the inventory issue among the fifteen claimants. To allow Hui Malama to unilaterally litigate the issue of inventory disclosure would deny equal weight to the rights and potentially divergent interests of the other Native Hawaiian groups involved. Absent the present disposition of the case, the court would require joinder of the other claimants.

**11.** The federal government consulted with Hui Malama pursuant to NAGPRA Section 3003(b)(1)(A) several times throughout the inventory process. However, Hui Malama presented no evidence indicating the existence of an explicit agreement between Hui Malama and the Federal Defendant regarding the inventory or repatriation of the Mokapu remains. Any agreement concerning the Mokapu remains entered into prior or to completion of the inventory between these two parties would nonetheless be invalid. NAGPRA does not restrict federal agencies or museums from entering into agreements as to the disposition of cultural items with the consent of the culturally affiliated tribe or organization. *See* 25 U.S.C. § 3009(1)(B). However, no such affiliation could have been appropriately determined prior to conducting the inventory and reviewing the claims of all interested parties. *See* 25 U.S.C. §§ 3003, 3005. The court will therefore review Count II in the statutory context only.

**12.** NAGPRA Section 3010 provides:
§ **3010. Special Relationship between Federal Government and Indian Tribes**
    This chapter [NAGPRA] reflects the unique relationship between the Federal Government

and Indian tribes and Native Hawaiian organizations and should not be construed to establish a precedent with respect to any other individual, organization or foreign government.
25 U.S.C. § 3010. The court disagrees with Hui Malama's assertion that Section 3010 establishes a trust or fiduciary relationship between the government and Hui Malama. If Congress had intended to establish such a relationship, it could have used explicit language. It is not permissible for the court "to construe a statute on the basis of a mere surmise as to what the Legislature intended and to assume that it was only by inadvertence that it failed to state something other than what it plainly stated." *Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1332 (4th Cir. 1976) (citing *United States v. Deluxe Cleaners and Laundry, Inc.*, 511 F.2d 926, 929 (4th Cir.1975)). This court has previously found that the federal government has no trust responsibility to Native Hawaiians where the relevant statutory language does not explicitly indicate a trust duty. *Han v. Department of Justice*, 824 F.Supp. 1480, 1486 (D.Hawaii 1993), *aff'd* 45 F.3d 333 (9th Cir. 1995).

Here, the court views NAGPRA Section 3010 as a disclaimer intended to ward off tangential repatriation claims from groups other than Native Americans or Native Hawaiians rather than as establishing a fiduciary obligation on the federal government. Accordingly, the court finds there is no violation of NAGPRA Section 3010, and will address Count II in light of Section 3003 only.

**13.** FOIA is codified at 5 U.S.C. § 552.

107 L.Ed.2d 462 (1989) (citing *Department of Air Force v. Rose,* 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976) (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965))). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978).

### 1. The Inventory is Subject to FOIA

██ FOIA provides that "every agency shall, upon request for identifiable records . . ., make such records promptly available to any person." 5 U.S.C. § 552(a)(4)(A). Although the Act does not specifically define what constitutes an "agency record," the United States Supreme Court has proffered two standards which materials must meet to qualify as "agency records" under FOIA. First, the agency must "either create or obtain" the requested materials. Second, "the agency must be in control of the requested materials at the time the FOIA claim is made." *United States Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 145, 109 S.Ct. 2841, 2848, 106 L.Ed.2d 112 (1989); *see also Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 150–52, 100 S.Ct. 960, 968–69, 63 L.Ed.2d 267 (1980).

██ The Mokapu inventory qualifies as an agency record under these standards. The Federal Defendant contracted for and obtained the inventory. In addition, the inventory is in the Federal Defendant's control now and for the foreseeable future.[14] As such, the inventory constitutes an agency record for FOIA purposes and is subject to the Act's disclosure requirement, unless one of FOIA's enumerated exemptions applies.

### 2. No FOIA Exemptions Apply to the Inventory

██ FOIA contains specific exemptions that allow non-disclosure in certain narrow circumstances. The exemptions do not, however, obscure the clear underlying policy of full disclosure where the exemptions do not directly apply. *See John Doe Agency,* 493 U.S. at 152, 110 S.Ct. at 475; *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599. The exemptions are to be narrowly construed so that the underlying policy of full disclosure is furthered to the greatest extent possible. *See Department of State v. Ray,* 502 U.S. 164, 180, 112 S.Ct. 541, 550, 116 L.Ed.2d 526 (1991) ("[W]e have repeatedly held that FOIA's exemptions 'must be narrowly construed.'") (citing *John Doe Agency,* 493 U.S. at 152, 110 S.Ct. at 475).

██ The Congressional message behind FOIA is unequivocal. The government must make available documents it possesses to anyone who requests disclosure. Congress explicitly listed the only possible exemptions in the Act. *See* 5 U.S.C. § 552(b)(1)–(9). The spirit and purpose of FOIA mandate a strong presumption in favor of disclosure. *See Ray,* 502 U.S. at 173, 112 S.Ct. at 546.

As an agency record, the Federal Defendant can only withhold the Mokapu inventory if it falls under one of the nine FOIA exemptions. Both parties agree that only two of the nine exemptions potentially apply to the inventory, 5 U.S.C. Section 552(b)(3) ("Exemption Three") and 5 U.S.C. Section 552(b)(6) ("Exemption Six").

Exemption Three excludes materials specifically exempted by so-called "withholding" statutes. 5 U.S.C. § 552(b)(3). Exemption Six excludes materials such as personnel and medical files which, if released, would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The court finds that neither Exemption Three nor Exemption Six applies to the Mokapu inventory.

### a. *NAGPRA is not a Withholding Statute Under FOIA Exemption Three*

FOIA Exemption Three provides that the Act's general disclosure requirement does not apply to matters that are:

> of ripeness regarding a defense it caused the Federal Defendant to raise through its own Complaint.

---

**14.** Hui Malama argues that the FOIA defense is not ripe because there is no present request for disclosure. Hui Malama cannot argue the issue

specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3). For NAGPRA to qualify as a withholding statute for FOIA purposes, it must fit within Subsection A or B of Exemption Three.

"When interpreting a statute, the court's objective is to ascertain the intent of Congress and to give effect to legislative will." *Meyerhoff v. EPA,* 958 F.2d 1498, 1501 (9th Cir.1992) (citing *Moorhead v. United States,* 774 F.2d 936, 941 (9th Cir.1985)). "It is assumed that the legislative purpose is expressed by the ordinary meaning of the words used, and absent a clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive." *Id.*

■ Courts have consistently held that a statute is a withholding statute for FOIA purposes only when it explicitly states in unambiguous terms that information gathered under the statute is not to be released to the public or is to be kept confidential. *See, e.g., Baldrige v. Shapiro,* 455 U.S. 345, 359, 102 S.Ct. 1103, 1111, 71 L.Ed.2d 199 (1982) (holding Census Act is a withholding statute as it explicitly provides for nondisclosure); *Association of Retired R.R. Workers v. Railroad Retirement Bd.,* 830 F.2d 331, 334 (D.C.Cir.1987) (finding Railroad Unemployment Insurance Act, which requires specific types of information to be kept confidential, to be a withholding statute).

■ FOIA became law in 1966. Congress passed NAGPRA in 1990, and did not make NAGPRA a withholding statute. The NAGPRA section dealing with inventories, Section 3003, does not explicitly exempt any information contained in inventories from disclosure. Nowhere does it contain any indication that inventory results are to be confidential or privileged in any respect. NAGPRA does not require that an agency withhold any matters from the public, much less

grant the government any discretion on the issue, *see* 5 U.S.C. § 552(b)(3)(A), nor does NAGPRA establish any criteria for withholding or refer to particular types of matters to be withheld, *see* 5 U.S.C. § 552(b)(3)(B). According to the plain language standard set forth in *Meyerhoff,* NAGPRA does not satisfy either Subsection A or Subsection B of FOIA Exemption Three.

■ Hui Malama argues that the language in NAGPRA which defines an inventory as a "simple itemized list" impliedly prohibits the inclusion of any further information. *See* 25 U.S.C. § 3003(e). According to Hui Malama NAGPRA thus mandates the withholding of any such additional information, thereby qualifying as an Exemption Three withholding statute. The court does not agree. The legislative history is replete with indications that the primary reason Congress included the simplified inventory definition in the statute was to alleviate the initial burden placed on agencies and museums in meeting the inventory compilation requirements under NAGPRA. *See generally,* H.R.Rep. No. 877, 101st Cong., 2d Sess. (1990). Contrary to any secretive intent, the legislative history actually suggests that where information exists, it should be made available generally where no undue burden on the government will ensue. *See* H.R.Rep. No. 473, 101st Cong., 2d Sess. (1990); *see also* infra part III.B.

According to its express language, its legislative history, and its spirit and purpose, NAGPRA does not qualify as a withholding statute under FOIA Exemption Three.

b. *Exemption Six Protecting Individuals From Invasions of Privacy Does Not Apply*

■ Exemption Six provides for the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This exemption aims to protect individuals from public scrutiny regarding personal affairs. In determining what constitutes a "clearly unwarranted invasion of personal privacy," the court must balance the privacy interests that would be harmed by disclosure against the public interest in the open dis-

semination of information in the government's control. *Ray,* 502 U.S. at 175, 112 S.Ct. at 548; *Department of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 762, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989); *Painting Industry of Hawaii v. Department of Air Force,* 26 F.3d 1479, 1482 (9th Cir.1994). "[U]nless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail." *Ray,* 502 U.S. at 177, 112 S.Ct. at 549.

The court need not reach this balancing approach, however, because the information contained in the inventory falls outside Exemption Six altogether. Exemption Six is intended to protect information regarding particular living persons. *See Department of State v. Washington Post Co.,* 456 U.S. 595, 602, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982). The cases addressing this exemption have uniformly dealt with revealing personal information about particular individuals, such as identity, wage information, home address, or religious affiliation. *See Department of Defense v. FLRA,* —— U.S. ——, ——, 114 S.Ct. 1006, 1013, 127 L.Ed.2d 325 (1994) (home address); *Painting Industry of Hawaii,* 26 F.3d 1479 (wage information); *Church of Scientology v. Department of Army,* 611 F.2d 738, 747 (9th Cir.1979) (religious affiliation). Congress' evident intent to protect the privacy of living members of contemporary society does not encompass the Mokapu remains. *Cf.* supra part II.A.

Even if Congress did intend to protect the privacy of individual human remains, information pertaining to a large group of individuals is not covered under FOIA Exemption Six. The main thrust of Exemption Six is to avoid identification of particular individuals. Where such a danger is absent or unlikely, Exemption Six is inapplicable. *See Arieff v. Department of the Navy,* 712 F.2d 1462, 1467–68 (D.C.Cir.1983) (holding that merely being one of a group of 600 persons who may be identified by the release of information relating to the entire group is not sufficient to trigger Exemption Six protection). As there is no real danger here that any particular individuals will be identi-

fied by disclosure of the inventory, the concern of Exemption Six is avoided.

Furthermore, according to the text of the statute, its legislative history, and the Supreme Court's interpretation of the exemption, Exemption Six "does not apply to an invasion of privacy produced *as a secondary effect* of the release." *Arieff,* 712 F.2d at 1468 (emphasis in original). To trigger Exemption Six protection, the actual production of the documents must constitute a clearly unwarranted invasion of "personal" privacy. *Id.* "Obviously, that can only occur when the documents disclose information [directly] attributable to an individual." *Id.; see also Rose,* 425 U.S. at 378–82, 96 S.Ct. at 1607–08 (holding mere speculation as to which particular individual may be affected by disclosure of government documents insufficient to invoke protection of Exemption Six); *accord* H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966) ("The exemption [5 U.S.C. § 552(b)(6) ] is ... intended to cover detailed Government records on an individual which can be identified as applying to that individual...."). Because there is no reasonable fear that any individual with a legally cognizable privacy interest will be affected by disclosure of the inventory, Hui Malama's invocation of Exemption Six fails on this basis as well.

In sum, this court will not create a new kind of privacy interest by expanding this limited statutory FOIA exemption while interpreting FOIA in connection with another statute, NAGPRA, which fails to provide for such an interest.

For the foregoing reasons, Exemption Six does not apply to the Mokapu inventory.

### 3. FOIA Precludes Exercise of Equity Power

Hui Malama also requests that, FOIA notwithstanding, this court use its equity power to prevent the release of inventory information. In enacting FOIA, Congress performed the balancing test normally performed by courts in determining whether to invoke equitable remedies in situations involving disclosure of government information. Congress found that, with the exception of materials that fall squarely within one

of FOIA's nine enumerated exemptions, the equities mandated disclosure. "The Act's broad provisions favoring disclosure, coupled with the specific exemptions, reveal and present the 'balance' Congress has struck" between the public's right to have access to government-controlled information and the government's need to keep certain information confidential. *John Doe Agency*, 493 U.S. at 152–53, 110 S.Ct. at 475. Congress intended to preempt the courts' discretion regarding disclosure of agency records. *See Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 144–45, 102 S.Ct. 197, 202, 70 L.Ed.2d 298 (1981); *Federal Open Market Comm. v. Merrill*, 443 U.S. 340, 351–52, 99 S.Ct. 2800, 2807–08, 61 L.Ed.2d 587 (1979).

A court's equity decision must "comport to and remain compatible with the prevailing legislative intent." *Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 863 (2nd Cir.1985), quoting *In re Bell*, 700 F.2d 1053, 1057 (6th Cir.1983), *cert. denied*, 104 S.Ct. 342, 343 (1983). Additionally, "a court's equity powers may not be exercised in such a manner as to deprive a person of constitutionally or statutorily protected rights." *Id.; see also Carter v. Gallagher*, 452 F.2d 315, 324 (8th Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

■ The Ninth Circuit specifically addressed the scope of courts' equity powers in the FOIA context in *Weber Aircraft Corp. v. United States*, 688 F.2d 638 (9th Cir.1982), *rev'd on other grounds*, 465 U.S. 792, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984). *Weber* held that courts may use their equity power to authorize nondisclosure of information under FOIA "only in 'extreme' or 'exceptional' circumstances." *Id.* at 646; *see also Theriault v. United States*, 503 F.2d 390, 392 (9th Cir.1974) (district courts may authorize nondisclosure using their equity powers only when "dire adverse potentialities" would result); *accord Halperin v. Department of State*, 565 F.2d 699, 706 (D.C.Cir.1977) (district courts have "some discretion in extreme circumstances" to use their equity powers to avoid disclosing government information which would "do grave damage to the national security"). In the instant case, Hui Malama has failed to legally substantiate its claim

that dire results will ensure from permitting the disclosure of the inventory information. The information contained in the inventory does not compromise national security. No extreme or exceptional circumstances exist which would justify this court in preventing the disclosure of the information contained in the Mokapu inventory in compliance with FOIA. This court must adhere to Congress' clear intent, recognized by the Ninth Circuit and other circuit courts, to ensure disclosure of government information where no narrowly-drawn statutory exemption applies. Accordingly, the court has no appropriate basis upon which to exercise its equity power to prevent disclosure of the Mokapu inventory.

### B. *NAGPRA Does Not Limit Disclosure of the Inventory*

■ The plain language of NAGPRA indicates that Congress did not intend to limit the disclosure of inventory information. It is fundamental that "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *see also Burlington N. R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987). As discussed below, NAGPRA contains no language evincing a legislative intent to keep any inventory information confidential. This court cannot hold otherwise.

Hui Malama first contends that NAGPRA's definition of an inventory as a "simple itemized list" evinces Congress' alleged intent to prohibit the disclosure of information regarding sex, age, and pathology. 25 U.S.C. § 3003(e). Accordingly, Hui Malama asserts that such information in the Mokapu inventory must be deleted. Contrary to Hui Malama's contention, the legislative history actually elucidates Congress' intent to provide for the disclosure of as much information as possible. Congress did not insert the language in NAGPRA defining an inventory as a "simple itemized list" as a stifling mechanism but rather as a minimum standard to

avoid placing undue time and cost burdens on museums and federal agencies. *See* Protection of Native American Graves and the Repatriation of Human Remains and Sacred Objects: Hearing on H.R. 1381, H.R. 1646, and H.R. 5237 Before the House Committee on Interior and Insular Affairs, 101st Cong., 2d Sess. 166–67 (1990) (statement of Dr. Richard H. Thompson, Director, Arizona State Museum; alerting Congress to the immense amounts of time and money which *mandatory* compliance with NAGPRA preliminary draft H.R. 5237's more detailed inventory requirements would entail). Congress intended not only to permit but to favor inventories containing more than a simple list to provide for more definite cultural affiliation and ethnicity determinations, which would in turn better satisfy NAGPRA's ultimate goal, accurate and efficient repatriation. *See* H.R.Rep. No. 877, 101st Cong., 2d Sess. 31 (1990). Drafters expressly anticipated occasional additional research during the inventory process to facilitate proper repatriation of human remains and other cultural items:

> The cost of preparing an accurate inventory of the origin and tribal affiliation of human remains can vary considerably depending on the information already available, *the amount of research needed to accurately determine tribal affiliation* and the contentiousness surrounding individual pieces. [Financial estimates for total repatriation include] *research to determine origin. . . . [E]xtensive studies costing up to $500–$600 per remain may be necessary to determine the origin of some of the remains;* however, such studies generally are not required by [NAGPRA].

S.Rep. No. 473, 101st Cong., 2d Sess. 19 (1990) (emphasis added). Not only did Congress consider that further research during the inventory process would often be necessary for proper repatriation, it impliedly approved it.

▮ NAGPRA Section 3003(e) contains no language which proscribes the kind of examination conducted by the Federal Defendant in the course of compiling an original inventory. Examinations done for the purpose of accurately identifying cultural affiliation or ethnicity are permissible because they further the overall purpose of NAGPRA, proper repatriation of remains and other cultural items. As discussed above, the legislative history bears out this intention. Commentators have also uniformly interpreted Section 3003(e) as permitting, though not requiring, further examination to facilitate proper repatriation. *See, e.g.,* Francis P. McManamon and Larry V. Nordby, "Implementing the Native American Graves Protection and Repatriation Act," 24 *Ariz.St.L.J.* 217, 247 (1992) ("Although *additional identification studies are not prohibited,* the initiation of studies to acquire new scientific information is not required as part of the inventory. Optional studies might include ethnographic research to help identify sacred objects, burial practices, *or physical anthropological studies to document or confirm ethnicity.*") (emphasis provided). Because NAGPRA contains no language demonstrating an intent by Congress to prevent museums or federal agencies from conducting the kind of examination that the Federal Defendant performed on the Mokapu remains during the inventory process, the results may be disclosed under NAGPRA.

▮ The legislative history also emphasizes the importance of ensuring access to available information on Native Hawaiian and Native American remains because of the "need to learn for the future from the past." H.R.Rep. No. 877, 101st Cong., 2d Sess. 13 (1990). At Congressional hearings Native American witnesses did not object to scientific studies as long as they had a specific purpose and definite time period. The only objection was to the indefinite retention of remains by museums for alleged "continuing" studies. *See* S.Rep. No. 473, 101st Cong., 2d Sess. 4–5 (1990). There is no indication that the Federal Defendant intended to delay or actually delayed repatriation of the remains by performing its cursory examination. According to the record, the information that the Federal Defendant gathered and included in the inventory was necessary for an accurate enumeration of the individuals represented by the Mokapu remains. No federal guidelines relating to NAGPRA inventory compilation existed at the time the Federal

Defendant compiled the Mokapu inventory.[15] Based on a careful review of the record the court finds that the Federal Defendant conducted the Mokapu inventory according to a good faith, reasonable reading of the statute. It obtained and included in the inventory information which it believed was necessary to accurately describe the remains in its possession. The Federal Defendant's interpretation of recently enacted legislation, an interpretation with which this court cannot disagree, is reasonable. The information provided furthered the identification of the cultural affiliation and ethnicity of individual skeletons,[16] and thus served NAGPRA goals.

According to the letter and spirit of NAGPRA Section 3003(e), the inventory was proper.

Hui Malama's alternative argument that NAGPRA Section 3003(b)(2) restricts the scope of inventories to exclude the information reported by the Federal Defendant is also unavailing.[17] Hui Malama misconstrues Section 3003(b)(2)'s language as prohibiting any and all examination of human remains in a museum or federal agency's possession. The organization contends that a museum or federal agency may only rely on the available written record in determining cultural or geographical affiliation. This is not the law.

**15.** The National Park Service issued guidelines for NAGPRA inventories and provided generic examples of proper inventories on March 3, 1995. Although the Federal Defendant did not have access to these guidelines, the examples promulgated therein provided for identification of age and sex and a description of the state of the remains. The Federal Defendant's examination resulted in the accurate determination of just such information. As the National Park Service is the agency charged with NAGPRA's implementation, this court affords substantial deference to that agency's interpretation of NAGPRA's inventory requirement. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (holding an agency's interpretation of a statute is entitled to particularly substantial deference where the agency is charged with administering the statute); *see also Rembold v. Pacific First Federal Sav. Bank*, 798 F.2d 1307, 1311 (9th Cir.1986), *cert. denied*, 482 U.S. 905, 107 S.Ct. 2480, 96 L.Ed.2d 373 (1987) (holding courts must defer to an agency's construction of a statute which Congress mandates that it implement, absent a showing that Congress would not have sanctioned such a construction).

**16.** Hui Malama contends that the Federal Defendant acknowledged that the cultural affiliation of the remains was "Native Hawaiian from the Mokapu Peninsula" in the contract authorizing the inventory even before the inventory began, and therefore any further examination of the remains was unwarranted. *See* Plaintiff's Supplemental Submission in Support of Plaintiff's Reply to Federal Defendant's Memorandum in Response to Plaintiff's Cross–Motion for Summary Judgment. This argument does not take into consideration the fact that the Federal Defendant discovered the inconsistencies in the available records only after it initiated the NAGPRA inventory. Some cursory examination became necessary to correct the mistakes and discrepancies contained in the Osteology Catalog and thereby compile an accurate inventory. In the course of the examination, the actual cultural affiliation of at least four sets of remains appeared ambiguous, and required more exacting scrutiny. Had the Federal Defendant blindly relied on the information available before the inventory process, some remains may have been repatriated to an incorrect party. Such a result is obviously not intended by NAGPRA and was probably avoided by the Federal Defendant's concern for accuracy.

**17.** Section 3003 provides in pertinent part:

**§ 3003. Inventory for human remains and associated funerary objects**
**(a) In general**
Each Federal agency and each museum which has possession or control over holdings or collections of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item.
**(b) Requirements**
(2) *Upon request* by an Indian tribe or Native Hawaiian organization which receives or should have received notice, a museum or Federal agency shall supply *additional available documentation to supplement the information required by subsection (a) of this section.* The term "documentation" means a summary of existing museum or Federal agency records, including inventories or catalogues, relevant studies, or other pertinent data for the limited purpose of determining the geographical origin, cultural affiliation, and basic facts surrounding acquisition and accession of Native American human remains and associated funerary objects subject to this section. Such term does not mean, and this chapter shall not be construed to be an authorization for, the initiation of new scientific studies of such remains and associated funerary objects or other means of acquiring or preserving additional scientific information from such remains and objects.
25 U.S.C. § 3003 (emphasis provided).

NAGPRA Section 3003(b)(2) merely prevents federal agencies and museums from conducting additional research after completion of the initial inventory. Section 3003(b)(2) is wholly inapposite to examinations conducted at the inventory compilation stage. The section's restrictive language only applies *"[u]pon request* by an Indian tribe or Native Hawaiian organization which receives or should have received notice [of the completed inventory, ... *for*] *additional available documentation to supplement the [inventory] information* required by subsection (a) of [Section 3003]." 25 U.S.C. § 3003(b)(2) (emphasis provided). Because the Federal Defendant did not conduct its examination in response to a request for information, Section 3003(b)(2) is of no consequence.

In light of the Congressional concerns which led to the enactment of NAGPRA itself, the reason for the distinction between inventory and post-inventory examinations is apparent. Congress intended for museums and federal agencies to conduct proper and complete inventories. Congress also wanted Native American and Native Hawaiian groups to have access to any existing information which museums or agencies possessed but did not include in the inventories, so that competing claimants could more fully assess their respective claims. However, Congress was very aware of museums and agencies which in the past had conducted protracted studies on Native American and Native Hawaiian remains without concern for timely repatriation of the remains to legitimate parties. Through NAGPRA Congress intended to correct this trend to the greatest practical extent. It therefore included Section 3003(b)(2)'s restrictive language to prevent agencies and museums from using a request for additional documentation as an excuse to initiate new studies and further delay the repatriation process. Section 3003(b)(2) targets additional studies unrelated to the initial inventory. "[NAGPRA Section] 3003(b)(2) does not preclude further scientific study" necessary to conduct the inventory itself in an accurate fashion. Jack F. Trope and Walter R. Echo–Hawk, "The Native American Graves Protection and Repatriation act: Background and Legislative History," 24 *Ariz.St.L.J.* 35, 62 (1992). Congress would not require accurate inventories under NAGPRA and then deny museums and federal agencies the necessary tools to comply effectively with that specific requirement.

By its own terms, then, Section 3003(b)(2) does not apply unless an Indian tribe or Native Hawaiian organization requests additional available documentation after the inventory is completed to supplement the inventory information. As no claimant requested additional information, Section 3003(b)(2) is irrelevant to the issue of whether the examinations were permissible.

The court finds that the Federal Defendant properly conducted its examination of the Mokapu remains under NAGPRA. Accordingly, the examination results are subject to disclosure.

## C. *NAGPRA Does Not Override FOIA*

Even if the court found that the Federal Defendant had violated NAGPRA, such a violation would not allow the court to grant the relief Hui Malama requests. As discussed above, NAGPRA does not contain any indication that Congress intended that it repeal or escape the disclosure requirements of FOIA. Where a statute equivocally repeals or avoids the operation of a prior act, the statute is strictly construed to effectuate a consistent operation with the previous legislation. *See Preston v. Heckler*, 734 F.2d 1359, 1368 (9th Cir.1984); *see also* 1A *Sutherland Statutory Construction*, § 23.10, at 353 (5th ed. 1992) ("Where the repealing effect of a statute is doubtful, the statute is strictly construed to effectuate its *consistent* operation with previous legislation.") (emphasis in original).

There is no language in NAGPRA demonstrating an intent to avoid or repeal FOIA. Furthermore, the plain language of NAGPRA and the lack of concern over secrecy in the legislative history demonstrate that Congress affirmatively intended disclosure versus withholding of information under NAGPRA provisions. *See* supra part III.B. Any potential violation of NAGPRA would not compel a subsequent violation of FOIA.

*CONCLUSION*

For the foregoing reasons, the court GRANTS the Federal Defendant's Motions for Summary Judgment on Counts I and II, and DENIES Hui Malama's Cross–Motion for Summary Judgment on Count II along with Hui Malama's requested relief.

IT IS SO ORDERED.