**FALLON PAIUTE–SHOSHONE TRIBE, a federally recognized Indian tribe, Plaintiff,**

v.

**UNITED STATES BUREAU OF LAND MANAGEMENT, Defendant.**

No. 03:04–CV–0466–LRH(RAM).

United States District Court, D. Nevada.

Sept. 21, 2006.

Brian W. Chestnut, Marc D. Slonim, Ziontz, Chestnut, Varnell Berley, et al., Seattle, WA, Gordon H. Depaoli, Woodburn and Wedge, Reno, NE, for Plaintiff.

Clementine Berger, Sacramento, CA, Devon L. McCune, Elsie B. Kappler, United States Department of Justice, Washington, DC, Gregory W. Addington, U.S. Attorney's Office, Reno, NV, for Defendant.

### ORDER

HICKS, District Judge.

Before the court are cross-motions for summary judgment in this matter. The Fallon Paiute–Shoshone Tribe (the "Tribe"), filed the first motion for summary judgment (# 31 [1]). This motion was met with an opposition (# 43) and cross-motion for summary judgment (# 44) from the Untied States Bureau of Land Management ("BLM"). The Tribe filed a joint reply and opposition on the motions (# 51), and BLM subsequently filed a reply to the Tribe's opposition (# 58).

In addition, each side has had *amicus curiae* briefs filed on their behalf. In support of the Tribe's position, a brief has been filed by the National Congress of American Indians, the Association on American Indian Affairs, the Morning Star Institute, and the Medicine Wheel Coalition on Sacred Sites in North America (# 50). In support of BLM's position, briefs have been filed by the Ethnic Mi-nority Council of America (# 35), the Friends of America's Past (# 37), the Ohio Archaeological Council (# 38), Doctors Harry Glynn Custred, Jr. and Andrei Simic (# 39), and Doctors Ives Goddard and Lyle Campbell (# 40). A notice of non-opposition to these *amicus* briefs has been filed by the Tribe (# 42).

## FACTUAL AND PROCEDURAL HISTORY

The heart of this matter concerns the right to possess the remains of an extremely ancient habitant of Northern Nevada. On the one side, BLM seeks possession of the remains to allow for further study by scientists around the world. On the other side, the Fallon Paiute–Shoshone Tribe ("Tribe") seeks possession of the remains to allow for reburial. The Tribe believes that because the remains have been disturbed the spirit of their ancestor is required to wander the world in a state of unrest. The importance of these remains to both sides and the story of their discovery and history is necessary to place this dispute in proper context.

The remains in question were found in 1940 during an excavation near Fallon, Nevada, in a place known as Spirit Cave. Sydney and Georgia Wheeler, working for the Nevada Parks Commission, unearthed multiple burials and several associated artifacts. The most important find in the excavation was the well-preserved, partially mummified body of a man now known as the Spirit Cave Man. The find was removed from the cave and analyzed. Upon initial review, it was believed that the Spirit Cave Man remains were between 1,500 and 2,000 years old. The remains were then placed in storage in the Nevada State Museum ("Museum"), where they have remained to the present.

---

1. References to (# XX) refer to the court's docket.

The Tribe states that the Spirit Cave, where the remains were found, is located on traditional tribal land and that the Tribe has long believed the area to be sacred. In fact, the Tribe states that its members have often avoided the cave out of respect. At the time of the discovery however, and to the present day, BLM controlled the land on which the cave sits. It is, though, just a short distance from Spirit Cave to the Tribe's reservation lands.

In 1990, Congress enacted the Native American Grave Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001, *et seq.* NAGPRA requires all government agencies possessing Native American remains and cultural items to provide a catalogue or inventory of those items with the purpose of facilitating the return of culturally affiliated remains and cultural items to their related Native American tribes. The enactment of NAGPRA and the efforts to inventory the Spirit Cave Man remains resulted in the current dispute.

As part of the inventory and identification process required by NAGPRA, radiocarbon dating was authorized on the Spirit Cave Man remains. The dating, completed in 1994 or 1995, showed that the initial estimate for the age of the bones, approximately 2000 years old, was significantly flawed. The remains were, in fact, nearly 10,000 years old and, accordingly, were a significant scientific find. The Spirit Cave Man remains were so unique that they received national media coverage including a feature on the program NOVA and articles in such papers as the New York Times and the Washington Post. The scientific community was also intrigued, with several more requests to study the remains being made after the discovery of their age. Around this same time, the Tribe began making inquiries about repatriation of the remains. As early as May 1996, the Tribe

requested that BLM temporarily inter the remains and cease all testing. The Tribe believes that it is the caretaker of the Spirit Cave Man remains and that disturbing the burial site of a deceased, such as the Spirit Cave Man, carries negative repercussions.

The Museum completed its NAGPRA required inventory in July 1996 and listed the Spirit Cave remains as unaffiliated. The inventory was provided to BLM, which put out a notice that the inventory had been completed in October 1996. BLM noted, as well, that it agreed with the affiliation determination and implied that notification of the determination would be followed by a brief period for responses before a final determination was made. However, this procedure never occurred and BLM authorized further study of the remains.

Results of these studies began appearing around February 1997, causing the Tribe to become upset that testing of the remains continued despite their religious beliefs. Accordingly, in May 1997, the Tribe requested repatriation of the remains as well as an end to further testing. BLM responded, noting the previous views of the museum that the remains were unaffiliated but stating that BLM would provide the Tribe with an equal opportunity to provide evidence of affiliation. In September 1997, BLM requested information about the Tribe's cultural origins and any other information that would not be available to BLM through its research efforts.

In early 1998, plans for a facial reconstruction project on the Spirit Cave Man remains were made public. The Tribe objected to the project, but the reconstruction occurred despite their concerns. The reconstructed face appeared on the cover of Newsweek and in other forms of national media. As of this time, BLM still held

the position that no determination had been made regarding affiliation.

The Tribe turned to the NAGPRA Review Committee for assistance in November 1998 after seeing the results of continuing testing on the Spirit Cave remains while being told that a determination of affiliation had not yet been made. However, the Review Committee was unwilling to discuss the Tribe's substantive arguments. In the Committee's view, there was no need for their involvement at the time because BLM had yet to make a determination on affiliation.

Bringing the matter to the Review Committee, however, resulted in BLM working harder to complete its affiliation decision. Accordingly, in January 1999, BLM stated that it planned to make a final decision on affiliation within 45 days. The Tribe requested, and was granted, an extension until June 1999 to submit additional evidence in support of affiliation. In addition, the Tribe decided to retain experts to present scientific evidence in support of affiliation. In doing so the Tribe sought, and received, a second extension to December 1999 in order to complete their projects and provide their evidence to BLM. BLM continued to maintain that no final decision on affiliation had been made. While seeking their second extension, the Tribe also requested BLM inter the Spirit Cave Man remains in a Fish and Wildlife Service vault used to store other Native American remains that had been previously discovered after a flood. This request was denied by BLM.

The Tribe was able to submit its scientific evidence and a memorandum summarizing its position in December 1999. As a result, BLM stated that it needed further time to review the Tribe's evidence before making a decision and that the Tribe's submissions would be forwarded to the Museum for review. The Museum re-sponded to the submission in January 2000, noting that it believed the remains were Native American but that it still viewed the remains as unaffiliated.

Finally, in August 2000, BLM released a 111 page report determining that the Spirit Cave Man remains were to be classified as unaffiliated. The report considered the relevant factors for determining affiliation expressed in NAGPRA and its implementing regulations. According to the Tribe, however, the report failed to discuss several scientific theories that had been raised by the Tribe's submissions and that it also failed to adequately distinguish the scientific evidence provided by the Tribe that it did consider. The paper also set a deadline of October 2000 for the Tribe to present any claims to the remains or objections to the report.

The Tribe, after reviewing the affiliation decision paper, requested an extension to respond until January 2001. BLM denied this request in October 2000 and issued a final determination that the remains were unaffiliated with any present day Native American tribe. BLM also referred the Tribe to the NAGPRA Review Committee, stating that the Committee might be able to aid the Tribe in its continuing request to have the remains repatriated.

In December 2000, the Tribe requested the Review Committee consider the matter and make findings concerning the affiliation of the remains and their potential repatriation to the Tribe. The Tribe presented its evidence to the Committee as well as several new pieces of scientific evidence that the Tribe had gained after BLM's final determination. BLM took the position that the Review Committee was an advisory board only. BLM did send its determination paper to the Review Committee, but chose not to attend the November 2001 hearing.

The Review Committee held its hearing and made its findings on the matter in November 2001. The Committee, on a 6–1 vote for each finding, determined that BLM had failed to fairly and objectively consider all the available and relevant information, that the Spirit Cave Man remains were in fact culturally affiliated with the Tribe, and that the remains should be repatriated to the Tribe. These findings were published in the Federal Register in April 2002.

In December 2001, the Tribe had the Review Committee forward all of the evidence before it, as well as its findings, to BLM. BLM remained committed to its position that the Review Committee was an advisory board and, in April 2002, decided that there was no need to respond to the Committee's findings. The Tribe contacted BLM, wondering if the agency would be considering the new evidence that had been provided to the Review Committee, as well as the Committee's findings. BLM's State Director noted that no further action was contemplated at that level and requested the Tribe take the issue up with superiors in Washington, D.C.

The Tribe chose to pursue this option. In November 2002, the Tribe wrote to the Secretary of the Interior, providing all the materials previously provided to BLM and the Review Committee as well as several other pertinent documents. In December 2002, the Tribe received a response from BLM's Acting Assistant Director for Renewable Resources and Planning. The response noted that the regulations regarding unaffiliated remains were still being promulgated and that it would be premature to take up the issue at that time. The Tribe objected to this response, and pursued its complaints.

In April 2003, BLM's Director requested a meeting with the Tribe to discuss their objections. The meeting occurred in Reno, Nevada in July 2003. As a result of the meeting, the Tribe received a letter stating that the Director was reviewing the matter and would respond when a course of action had been determined. In February 2004, the Tribe received another letter stating that their concerns had been addressed and that there was no further course of action to be taken at that time. This letter did not discuss the Tribe's evidence or make note of the Tribe's repatriation request. The Tribe responded in March 2004, stating that it considered BLM's previous letter to represent a final agency action and noting problems it had with BLM's review of the decision. This was the last communication between BLM and the Tribe concerning the Tribe's repatriation request and the determination of non-affiliation made by BLM.

The present lawsuit was filed thereafter. At this stage in the proceedings, the court is faced with cross-motions for summary judgment.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

A court will grant summary judgment if the pleadings and supporting documents, when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue as to any material fact is only "genuine" if the evidence regarding the disputed fact is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to preclude summary judgment]; there must be evidence on which the jury

could reasonably find for the plaintiff." *Id.*

## DISCUSSION

The court is faced with multiple arguments for and against BLM's determination that the Spirit Cave remains are unaffiliated with any present day Native American tribe. Upon review, the court notes that four major arguments exist. First, BLM argues that the issue is not ripe for review at this time. Second, an *amicus* brief raises the issue that the Spirit Cave Man remains cannot be classified as Native American under recent Ninth Circuit precedent, necessitating dismissal. Third, the Tribe makes three procedural objections under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, regarding how BLM's review procedures were handled. Finally, the Tribe attacks BLM's ultimate determination and subsequent denial of the Tribe's repatriation request as arbitrary and capricious. The court now turns to these arguments.

### 1. Ripeness

BLM opens its motion for summary judgment arguing that the current dispute is not ripe for review before this court. The doctrine of ripeness prevents courts from "entangling themselves in abstract disagreements over administrative policies" and protects "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The determination whether a case is ripe for review is required both by Article III's "limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538

U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)).

■■■ Generally, the determination whether an administrative action is ripe for review requires evaluation of: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808, 123 S.Ct. 2026. In addition, the APA requires that the agency action for which judicial review is sought be a final action for which there is no other adequate remedy in court. 5 U.S.C. § 704. An action is final when two conditions are met: (1) the action marks the consummation of the agency's decision making process, meaning it is neither merely tentative nor interlocutory in nature; and (2) the agency action taken is one by which rights or obligations have been determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

In this case, the dispute centers around BLM's determination that the Spirit Cave Man is unaffiliated with any current Native American group. This determination was made pursuant to NAGPRA, 28 U.S.C. § 3001 *et seq.*, and its accompanying regulations, 43 C.F.R. § 10.1 *et seq.* Accordingly, the determination is potentially subject to review under the APA because BLM is a government agency making a decision with apparent legal consequences. BLM, however, argues that its finding of non-affiliation is not final in that it can be reconsidered upon the introduction of any new evidence and, pursuant to NAGPRA, is technically an ongoing process. As such, BLM contends that no final agency action can be identified, precluding the case from being ripe for review.

While it is true that BLM may change its determination upon the discovery of any further evidence that demonstrates cultural affiliation, the difficulty in BLM's argument is that until such evidence is discovered, or 43 C.F.R. § 10.11 [2] is finally promulgated, the affiliation inquiry continues in perpetuity without providing an opportunity for meaningful review by the courts. NAGPRA is designed to allow for review both of over-enforcement and, more importantly to this case, under-enforcement of its mandates. *See* 25 U.S.C. § 3013 (granting district courts jurisdiction over "any action brought by any person alleging a violation"); *see also Bonnichsen v. United States*, 367 F.3d 864, 874 (9th Cir.2004) (noting that the statutory enforcement clause, 25 U.S.C. § 3013, "applies not only to actions ... asserting under-enforcement of NAGPRA, but also to actions ... asserting over-enforcement."). Thus, considering the interplay in this specific context between NAGPRA's authority to bring suit for under-enforcement and the APA's requirement that only final agency action be subject to review, it would appear illogical to determine that a potential instance of under-enforcement could not be contested because of a legislative delay which has precluded promulgation of a potentially dispositive regulation. However, this illogical construct would become the rule should BLM's actions not rise to the level of a final administrative action. Accordingly, the court now turns to that inquiry.

To reach its determination of affiliation, BLM gathered as much evidence as it could from the Museum and its scholars. It then reached, through some consultation with the Tribe, a tentative determination that the remains were not affiliated with any present day Native American group. After this determination, the Tribe provided its evidence for a finding of affiliation. BLM did not change its determination. At that point, the Tribe had provided all of the evidence it was able to gather, and in doing so, summarized the state of evidence available at the present date that supported its claim of affiliation. BLM did not change its view, and informed the Tribe that its previous determination would stand.

To say this determination is tentative in nature simply avoids the facts. At the time of this decision, BLM had collected and summarized what it believed to be the state of the evidence up to the present date. The Tribe had likewise done the same, seeking to compel BLM to change its tentative determination. BLM, thus, had a full range of evidence, taking into account nearly every conceivable scientific finding to date concerning the Spirit Cave Man. After receiving this evidence, BLM upheld its determination that affiliation could not be proved by a preponderance of the evidence.

At this point, there was no more evidence to be submitted. BLM's prior determination of non-affiliation was being upheld and, although BLM was open to

---

**2.** 43 C.F.R. § 10.11 has been reserved in the Code of Federal Regulations for a regulation entitled "Disposition of culturally unidentifiable human remains." It is agreed between the parties that this regulation, when finally created and added to the code, would determine how the Spirit Cave Man's remains would be distributed if finally classified as unaffiliated. However, BLM's argument that the matter is not ripe because this regulation

has not been promulgated, making the affiliation inquiry potentially a perpetual exercise, cannot be accepted. When the regulation is finally added to the code, issues such as the one debated here may well become moot. However, the fact that a future act may moot a present dispute does not result in the correlating finding that the present dispute is therefore not ripe for review.

further evidence, there was no realistic expectation that any would surface. Considering these facts, it must be said that BLM made a final determination. Its decision cannot be characterized as temporary or interlocutory in nature because all relevant evidence has been considered and every interested party has had a chance to present their arguments. The fact that there is a remote possibility that future evidence will be discovered, which might change BLM's determination, is not enough to displace the practical effect of this decision.

■ Looking at the state of BLM's decision-making process, the court is confident that the action taken by BLM should be classified as final. Having considered all the evidence available to the present date, the court's review would not deny BLM the opportunity to correct any mistakes it may have made. *See F.T.C. v. Standard Oil Co. of Cal.,* 449 U.S. 232, 242, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). BLM had that opportunity when the Tribe provided its evidence for affiliation. Likewise, since all evidence has been considered, a piecemeal review would not occur. *Id.* BLM has made its determination. There is no further agency process which needs to proceed, save implementation of a non-existent regulation. Thus, the court can efficiently review BLM's actions and is not likely to have its review proven unnecessary by further BLM action. Finally, judicial review would not delay the proceedings in this matter as there are no further proceedings contemplated unless new evidence is discovered and provided to BLM. *Id.* Considering all these factors, and the interplay between NAGPRA's enforcement clause and the APA, the court concludes that a final administrative action has occurred.[3]

The court thus turns to the second prong of the inquiry, whether legal consequences flow from the action or whether the action determines rights or obligations. *Bennett,* 520 U.S. at 177–78, 117 S.Ct. 1154. In this matter, the Tribe alleges that its right to repatriation of the Spirit Cave Man's remains has been denied. The court finds this allegation sufficient to meet the requirements of the second prong of the present inquiry. After consideration of all available evidence, BLM has concluded that the Tribe is not entitled to repatriation of the remains because no cultural affiliation has been proven. Further, as no regulation defines the actions to be taken by BLM in cases where a lack of affiliation exists, the court has concluded

**3.** The case of *Na Iwi O Na Kupuna O Mokapu v. Dalton,* 894 F.Supp. 1397 (D.Haw.1995) is not to the contrary. In *Dalton,* the court faced a situation where a determination of cultural affiliation had been made but multiple claims to the remains had been submitted. In a discussion appropriately considered *dicta,* the court noted that the government had been properly following the regulations constructed for repatriation of affiliated remains claimed by multiple groups. Since the government had not yet reached a decision and because there was no undue delay, the court found the repatriation issue was not ripe for review. However, the court did point our that a ripe claim would exist if "a party were to make a colorable claim that a federal agency or museum was not properly following NAGPRA repatriation procedures and was thereby causing undue delay" even if no final agency action existed *Id.* at 1405 n. 5. The gravamen for a ripe claim, according to the *Dalton* court, was a "present objection... that the current repatriation process violates NAGPRA procedural mandates." *Id.*

In this case, the Tribe asserts just such an objection. According to the Tribe's claims, BLM has ignored key evidence and consultation requirements mandated by NAGPRA's regulations. This resulted in a finding that the Spirit Cave Man remains are not affiliated with the Tribe and caused undue delay in repatriating those remains. While the court does not pass, yet, on the legitimacy of these claims, it is of note that they fall well within the proscribed requirements of *Dalton.*

that the process should be treated as complete. Allowing BLM to simply hold the bones leaves all parties in limbo. Such a result runs contrary to the enforcement provision of NAGPRA. Thus, unless new evidence were to be presented to BLM, the Tribe's rights to the remains, should they have any, have been determined. Accordingly, BLM's determination, based on the evidence present before it, was both final and determined the rights of the Tribe in relation to the Spirit Cave Man's remains.

Having concluded that BLM's actions in this instance constitute a final agency action, the court notes that the remaining requirements under the ripeness test have been satisfied. Given that there are no continuing proceedings which would be undermined by the court's review of this matter, it is apparent that this matter is now fit for a judicial decision. Also, considering the potential for delay in making a final determination of affiliation and the alleged spiritual beliefs of the Tribe concerning disinterred bodies of tribal members, the court concludes that significant hardship will face the Tribe, and, for that matter, BLM[4] if the court withholds a determination in this matter. Accordingly, the court concludes that this matter is ripe for decision. *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808, 123 S.Ct. 2026.

### 2. Status of Spirit Cave Man Remains as Native American

Before reaching the APA challenges concerning BLM's determination that the Spirit Cave Man remains are unaffiliated with any Native American tribe, the court notes that the question whether the remains are Native American at all has been raised in the *amicus curiae* brief filed by the Friends of America's Past (# 37). The court notes that *Bonnichsen*, 367 F.3d at 882, strongly suggests that remains as old as the Spirit Cave Man's are not likely to be classified as Native American. However, the court is not faced with making such a determination here.

The issue is not jurisdictional and is subject to waiver if not contested. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 1245, 163 L.Ed.2d 1097 (determining employee numerosity requirement of Title VII employment action is not jurisdictional in nature and providing that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-jurisdictional in character."). Both the Tribe and BLM have stated that the remains are Native American. As the issue is raised only through an *amicus* brief and the parties have chosen not to contest the designation of the remains as Native American at this time, the court will not entertain the request by the Friend's of America's Past to conclude that NAGPRA is inapplicable to the current situation. *See* 4 Am.Jur.2d *Amicus Curiae* § 7 (2006) (noting that an *amicus* brief "ordinarily cannot inject new issues into a case which have not been presented by the parties").

### 3. Challenge Under the APA

In challenging BLM's determination that the remains are not affiliated with a Native American group, the Tribe has attacked BLM's decision-making process via the APA. Under the APA. the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with

---

4. BLM's hardship will come in the form of continuous preservation of the bones without a significant opportunity for further study based on the continuing dispute over affiliation.

law;... [or] (D) without observance of procedure required by law..." among others. 5 U.S.C. § 706(2)(A), (D). The Tribe claims both that BLM failed to observe procedures required by law and that its decision was arbitrary and capricious.

### a. Observation of Procedures Required by Law

The Tribe's allegations concerning BLM's failure to observe the procedures for repatriation required by NAGPRA describe three distinct failures. First, the Tribe contends that BLM failed to consult with the Tribe as required by 25 U.S.C. § 3003(b)(1)(A). Second, the Tribe argues that the forty-five (45) day time limit set by BLM for the tribe to provide evidence of affiliation pursuant to 25 U.S.C. § 3005(a)(4) was improper. Finally, the Tribe suggests that BLM's ultimate determination failed to observe the importance of the NAGPRA Review Committee formed pursuant to 25 U.S.C. § 3006.

To fully understand how the Tribe's arguments fit within NAGPRA's statutory framework, it is helpful to sketch how NAGPRA is designed to work. As this case only deals with Native American human remains that were in BLM's possession prior to NAGPRA's enactment, the court will focus primarily on the procedures required for such holdings.

NAGPRA is in essence a dual statute enacted to facilitate the return of Native American cultural items and remains to the tribes with whom those items are affiliated. One portion contemplates government action when Native American remains are found post-enactment. 25 U.S.C. § 3002. This provision of the act attempts to quickly and efficiently return the remains by designating several different groups which could be entitled to the remains. *See id.* at § 3002(a)(1)-(2) (providing for ownership of remains to be pro-

vided to a Native American tribe whether the remains are deemed affiliated with a particular tribe or deemed unaffiliated). The other portion of the statute deals with all Native American remains held by government agencies prior to enactment of NAGPRA. *Id.* at §§ 3003, 3005. This latter portion of the statute is the one relevant to the present dispute.

For remains held by government agencies prior to NAGPRA's enactment, each federal agency is required to "compile an inventory of such [remains] and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such [remains]." *Id.* at § 3003(a). Cultural affiliation must only be proven by a preponderance of the evidence, not by scientific certainty, and such a finding should not be precluded merely because there are gaps in the historical record. 43 C.F.R. § 10.14(d), (f). In making the determination of affiliation, three things must be proven: (1) the existence of an identifiable present-day tribe; (2) evidence of the existence of an identifiable earlier group; and (3) evidence of the existence of a shared group identity that can be reasonably traced between the present day tribe and the earlier group. *Id.* at § 10.14(c). The types of evidence to be considered in this determination are geographical, kinship, biological, archeological, anthropological, linguistic, folklore, oral tradition, historical, or other relevant information or expert opinion. *Id.* at § 10.14(e).

The applicable statutes and implementing regulations show that, while consultation is required with any Native American tribe to whom the remains may likely be repatriated, the decision at this stage is driven primarily by the government agency holding the remains. *See* 25 U.S.C. § 3003(a) (requiring that inventory be

complied by the government agency having "control over holdings or collections of Native American human remains" from the "information possessed" by that agency); *Id.* at § 3005(a)(4) (providing Native American tribes an opportunity to demonstrate affiliation if initial determination does not result in finding of affiliation); 43 C.F.R. § 10.9(b) (requiring consultations be started early in the inventory process but defining them more in the way of providing the information used to determine affiliation to the interested tribes rather than mandating the agency receive specific affiliation information from the Native American tribes involved). Thus, while consultation is mandated by NAGPRA, at this stage in the proceedings the agency is required primarily to share its scientific findings with the tribes and ensure that the interested tribes are fully apprised of how the government agency is reaching its decision. The statutory scheme thus appears to contemplate an initial determination based upon the evidence that the government already has, which can later be supplemented if an interested tribe objects to the government's findings.

When this initial review of the remains held by an agency results in a finding that the remains are affiliated with a Native American tribe, the remains are to be repatriated expeditiously upon request. 25 U.S.C. § 3005(a); 43 C.F.R. § 10.10(b). When the remains are deemed unaffiliated, however, the process is not considered complete. After a finding of non-affiliation, interested Native American tribes are permitted to provide their own evidence, both scientific and cultural, in an attempt to demonstrate affiliation. 25 U.S.C. § 3005(a)(4) (mandating that unaffiliated human remains be repatriated to Native American tribes which can show "cultural affiliation by a preponderance of the evidence" based on multiple factors). It is at this stage that the statute begins to contemplate the introduction of competing scientific studies on behalf of the interested Native American tribes. *See id.* (Evidence may be based upon "geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion."). It is then the government agency's job to weigh the competing evidence for affiliation and update its findings accordingly. Remains subsequently deemed affiliated must be repatriated, *id.*, while remains that continue to be classified as non-affiliated are subject to the provisions of 43 C.F.R. § 10.11, which has yet to be promulgated.

Thus, the general statutory scheme for dealing with remains such as those involved in the present case is as follows. First, the government agency completes, while engaging in appropriate consultation with interested Native American tribes, a study of the remains using the scientific evidence it has available along with the cultural and traditional evidence provided by the tribes. This process is completed openly, with the tribes having full access to the government's process and procedure. When the government's evidence cannot demonstrate affiliation, interested Native American tribes are given an opportunity to provide their own scientific evidence as well as any further relevant cultural or traditional evidence in an attempt to demonstrate by a preponderance of the evidence that the remains are in fact affiliated with their tribe. The government should then review that evidence and update its findings accordingly. If the remains are then found to be affiliated, they should be repatriated. If not, the remains are effectively placed in the care of the government until such time as an appropriate regulation for their permanent placement is promulgated.

When problems arise in this process, the statutory scheme contemplates initial assistance from a review committee comprised of neutral appointed experts. 25 U.S.C. § 3006. This committee is charged with overseeing the identification and affiliation process and with facilitating the resolution of disputes between interested Native American tribes and the Federal agencies complying with NAGPRA. *Id.* at § 3006(c). The findings made by this committee are expressly made admissible in court by section 3006(d) when an action is brought to enforce NAGPRA. However, the findings and conclusions of the Review Committee are merely advisory and are not considered binding on any party. 43 C.F.R. § 10.16(b). Despite this advisory role, though, the applicable statutes and regulations show that the Review Committee plays an integral role in facilitating the resolution of disputes arising under NAGPRA.

Having summarized NAGPRA's intended process and its dispute resolution mechanisms, the court now turns to the Tribe's contentions that BLM failed to adhere to the procedures delineated above.

*I.  Consultation*

■  The Tribe contends that BLM failed in its duty to consult with the Tribe in two distinct ways. First, the Tribe argues that BLM failed to consult in any manner after the tribe retained experts to present their opinions on the affiliation issue. Second, the Tribe states that BLM failed to adhere to the consultation requirements of 43 C.F.R. § 10.9(b)(4)(ii). In response, BLM notes that it held several meetings with the Tribe and states that it believes these meetings satisfied its consultation requirements.

The focus of the Tribe's argument on this point is the fact that once the tribe retained its experts, it believes BLM completely shut it out of the decision making process. The Tribe does note, however, that prior to the retention of its experts there were at least some meetings that touched on the affiliation issue and would be considered consultation. After considering the Tribe's arguments and the evidence supporting them, the court concludes that BLM did not violate its duty to consult with the Tribe regarding affiliation.

The statutory and regulatory scheme outlined previously demonstrates that the initial decision on affiliation was ultimately that of the government agency having possession of the remains. The regulations on consultation further demonstrate that the process is not designed to foster an academic debate on the issue of cultural affiliation, but rather to aid the government agency in compiling the necessary cultural data needed to reach its decision and to work on an agreement with interested Native American tribes regarding how the overall process should work. For example, 43 C.F.R. § 10.9(b)(4), the main regulatory provision contested by the Tribe in this argument, requires the government agency to "request, as appropriate" information from interested parties which includes "recommendations on how the consultation process should be conducted." These recommendations concerning the consultation process, however, are limited to information such as names and contact information for lineal descendants of the remains, 43 C.F.R. § 10.9(b)(4)(ii)(A), and names and contact information of religious leaders who would have information about the remains and their associated funerary objects. *Id.* at § 10.9(b)(4)(ii)(B). Thus, the type of information sought to be gained from the consultation process is not that which would ignite a full academic debate on affiliation, but rather the type of information that only the interested tribes could provide

regarding the remains such as their connection to current descendants and their relation to the burial practices of the interested tribe.

The Tribe does not contest BLM's information gathering practice, but rather its failure to extend the scope of the consultation to allow the Tribe to present scientific evidence which would refute BLM's initial determination. This is not the purpose of the initial consultation requirement, and therefore no violation of NAGPRA can be found in BLM's failure to comply with the Tribe's requests at this stage.

The court is aware that the NAGPRA Review Committee found that BLM wholly failed to consult with the Tribe when it reviewed the matter. While this evidence, as noted above, is admissible, it is not binding on the court. It is possible to see why the Review Committee would reach such a conclusion. However, given the purposes of the initial consultation requirements, BLM's failure to continue meetings and consultations with the Tribe after it retained experts and sought to introduce that evidence into BLM's decision-making process is not an error under the statute.

## II. 45–day Deadline

The Tribe next argues that BLM imposed a 45–day deadline to respond to its final determination of non-affiliation that was without statutory or regulatory support and against the procedures of law required by NAGPRA. BLM responds by setting forth three reasons why the 45–day deadline was not improper. First, BLM states that it had been asking the Tribe to provide information regarding repatriation since April, 1996. Second, BLM claims that the Tribe had repeatedly criticized BLM for its delay in the proceedings yet waited until 1999 to retain experts and seek an extension. Finally, BLM notes that its finding of non-affiliation requires it to continue to accept and consider evidence provided by the Tribe.

The court notes that an agency has the freedom to "fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous duties." *FCC v. Pottsville*, 309 U.S. 134, 143, 60 S.Ct. 437, 84 L.Ed. 656 (1940). This authority allows for agencies such as BLM to set deadlines as needed in order to ensure the timely and proper disposition of matters before it. Thus, the issue before the court is whether the 45–day deadline was improperly short as a matter of law given the extensive time spent by BLM to reach a determination of non-affiliation.

The court, however, need not reach a decision on this issue. As the decision to uphold the non-affiliation finding is deemed arbitrary and capricious below, any potential procedural error surrounding when materials needed to be submitted is moot because BLM will once again be required to acknowledge and consider the evidence heretofore presented by the tribe when upholding or reversing its previous determination.[5]

5. The court notes that this issue is the only of the three procedural issues which is rendered moot by the finding of an arbitrary and capricious decision on the Tribe's repatriation request. If BLM had not followed the statutory consultation requirements, the remand might well have required BLM to begin the entire decision making process anew. If the following inquiry regarding interactions with the Review Committee discovered an error BLM might well be required to change its determination to comply with the Review Committee findings without further chance for analysis by BLM. However, even if an error were found concerning the 45–day deadline, no additional action would be required by BLM. This is because the remand based on an arbitrary and capricious decision already requires BLM to consider the full range of evidence before it: evidence which includes all of the

### iii.   Review Committee

The Tribe also contends that BLM did not observe the procedures required by law in this matter by failing to properly engage in the proceedings of, and consider the recommendations made by, the Review Committee.   The Review Committee was first brought into this matter in November, 1998.   At that time, the Review Committee determined that, as no decision on affiliation had been made by BLM, their involvement would be premature and declined to consider the matter.   The Review Committee was next consulted in October, 2000.   A hearing was held in which the Tribe presented evidence not previously considered by BLM, and BLM provided its previous determination to the committee but did not attend the hearing.   The committee decided in November 2001, on a 6–1 vote in all matters, that BLM had not engaged in proper consultation with the Tribe, that the remains of the Spirit Cave Man were in fact culturally affiliated with the Tribe, and that the remains should be repatriated.

BLM took the position that the Review Committee had no authority to issue binding decisions regarding affiliation and did not change its position on affiliation. However, the matter was then passed up the chain of command where it was to be reviewed by higher ranking BLM officials. The Tribe contends that BLM's refusal to reconsider its position upon the Review Committee's findings and its choice not to participate in the proceedings themselves failed to adhere to the procedures required by NAGPRA.   The court disagrees.

The Review Committee is responsible for "reviewing and making findings related to" the cultural affiliation of remains and the return of those remains when requested to do so by an affected party. 25 U.S.C. § 3006(c)(3)(A)-(B).   The Review Committee is also charged with "facilitating the resolution of any disputes" between Native American tribes and government agencies. *Id.* at § 3006(c)(4).   However, the regulations promulgated demonstrate that the Review Committee is merely an advisory board whose determinations, while persuasive, are not binding on either the Native American tribes or any government agency.   43 C.F.R. § 10.16(b).   Neither party has contested the advisory role of the Review Committee nor alleged that its determinations should be binding on the parties. Thus, the court is faced with determining what level of participation in and consideration of the Review Committee's actions is mandated by NAGPRA.

■ The court concludes that, under the facts of this case, BLM has complied with the minimum participation requirements NAGPRA imposes on parties when dealing with the Review Committee.   It is not disputed that BLM failed to attend the Review Committee hearing in which the Tribe presented its evidence for affiliation. However, nothing in the statutes or regulations involved here mandate actual physical presence at the hearing.   The Review Committee's work as an advisory board means that it does not have to have both parties physically present before it in order to properly review the evidence and make a recommendation on action.   BLM did not altogether shun its obligations to the Review Committee, either.   BLM provided its full decision, which included the reasoning behind its findings to the Review Committee, as its statement on why its decision was proper.   It was BLM's

Tribe's evidence to date.   BLM will, of course, be expected to set a reasonable deadline for any additional evidence that may exist, but that deadline would not be affected by any decision regarding the previous deadline and its relation to the affiliation determination process.

choice whether to further defend its position at this stage or simply rely on its previous work. BLM's choice to rely on its previous work was not unreasonable and certainly did not fail to observe the procedures required by NAGPRA.

The court also finds no error in BLM's failure to reconsider its decision purely on the basis of an adverse ruling by the Review Committee. As noted, the Review Committee is an advisory board, although its decisions could be given substantial weight should a dispute reach the courts. There is, however, nothing in the statutes or regulations which compels a government agency to follow the directives of the Review Committee. Further, this court is not interested in reading into the statute a mandate to reconsider a previous decision made by a government agency based solely on the views of the Review Committee when there is an adequate mechanism for further review. Namely, interested tribes may seek to prove affiliation by a preponderance of the evidence when a finding of non-affiliation is made.

It is important to note that the court does not conclude that the Review Committee findings carry no weight or are insignificant in the overall scheme of NAGPRA. As will be seen below, the Review Committee findings are indeed relevant when determining whether a government agency's determination of non-affiliation is arbitrary or capricious. However, this value of the Review Committee's findings does not create an independent duty for government agencies to review or amend their findings merely because the Review Committee has disagreed with them. The impetus for review comes from the interested Native American tribe's right to present evidence to prove affiliation, not from the Review Committee's ability to provide advisory findings and opinions in the matter. As such, the court cannot conclude that BLM failed to adhere to the procedures required by NAGPRA when it chose not to participate in the Review Committee proceedings or when it chose not to review its prior decision based purely on the adverse opinion of the Review Committee.

### b. Decision as Arbitrary and Capricious

Substantively, the Tribe attacks BLM's determination that the Spirit Cave Man remains are not affiliated to any present day Native American tribe by claiming that decision is arbitrary and capricious. The APA allows a court to overturn an agency's decision when the contested "agency action, findings, and conclusions [are] found to be ... arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law ...." 5 U.S.C. § 706(2)(A). In *Bonnichsen v. United States*, 969 F.Supp. 628, 644 (D.Or.1997) (*Bonnichsen I*)[6], the court, citing to *Northwest Motorcycle Association v. United States Department of Agriculture*, 18 F.3d 1468, 1471 (9th Cir.1994), and *Mt. Diablo Hospital v. Shalala*, 3 F.3d 1226, 1232 (9th Cir.1993), summarized when an

**6.** The court cites to the District Court opinions in the *Bonnichsen* line of cases, recognizing that several issues were appealed and multiple orders were eventually entered. However, as the *Bonnichsen* line of cases represent the primary, and most complete, prior treatment of issues arising under NAGPRA, the court finds all aspects of that case which have not been overturned on appeal persuasive. For this particular issue, the court notes that the *Bonnichsen* court summarized the considerations surrounding an allegation that an agency decision is arbitrary and capricious. While an appeal was taken, this issue, and the court's views on this matter, were not contested at the appellate level. Thus, the court finds the *Bonnichsen* court's analysis on the arbitrary and capricious issue instructive in this matter.

agency decision will be considered arbitrary and capricious. According to *Bonnichsen I,* the agency decision must be based on a consideration of the relevant factors. Further, the failure of an agency to gather or to consider relevant evidence may result in the decision being set aside. Finally, in considering the relevant evidence, an agency must "articulate a satisfactory explanation of its action including a rational connection between the facts found and the choice made." *Bonnichsen I,* 969 F.Supp. at 644.

The Tribe attacks BLM's decision on the aforementioned grounds. Specifically, the Tribe contends that the scientific evidence it provided to BLM prior to its final determination was not properly considered in BLM's position paper. Further, the Tribe contends that BLM did not consider the findings of the Review Committee when its final decision was contested through the statutory review process. Finally, the Tribe contends that BLM failed to consider the scientific evidence that was first provided to the Review Committee after BLM's final determination of non-affiliation.

The court first recalls that BLM was under no obligation to accept the Tribe's scientific evidence prior to making its own initial determination regarding affiliation. As noted above, the statute contemplates a gathering of information available to BLM for the purpose of making an internal determination on affiliation. However, BLM chose to accept the Tribe's initial offering of scientific evidence.[7] As such, it appears improper to the court to conclude that, despite having the Tribe's scientific evidence and a premature request for repatriation, BLM was under no obligation to fairly consider the Tribe's submissions. However, the court need not determine whether BLM properly considered this evidence, as the process of determining affiliation finally concluded with a finding of non-affiliation.

■ At the point of BLM's finding that the remains were not affiliated with a present day Native American tribe, the Tribe's request for repatriation became ripe. In the process of that dispute, the Tribe turned to the Review Committee to review BLM's determination and to help settle the matter. As part of those proceedings, the Tribe provided previously unknown scientific evidence to the Committee.

In reviewing the post-Review Committee proceedings in this matter, the court finds that BLM did not fairly and adequately consider the evidence provided by the Tribe and the Review Committee's findings. When the matter was returned to BLM, it responded by claiming that the Committee's findings were merely advisory and not binding. While this statement is no doubt accurate, it avoids the fact that a repatriation request was pending, which necessitated a thorough review of the evidence, including the basis for the Committee's findings. Rather than conduct that review, BLM passed the issue up the chain of command. While there are factual implications which suggest that the evidence was reviewed to some extent, there is no overarching determination by BLM which explains the reasons for its actions and determinations. This demonstrates error, for an agency must, despite being given

---

7. As noted previously, the procedural position of this case is fairly muddled. The Tribe entered its request for repatriation prior to a final decision on affiliation. BLM entered tentative findings of non-affiliation but later backed off those findings to further research the issue. BLM then accepted the scientific evidence the Tribe presented prior to making its final determination on affiliation. The court has taken account of both the actual procedure and the expected procedure in determining whether an error exists.

great leeway in exercising its discretion, "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48–49, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

In this matter, there is no cogent explanation why BLM chose to deny the repatriation request. There is no weighing of the competing evidence, nor is there an explanation why the Tribe's evidence is not sufficient or the Review Committee's findings are not persuasive. While the court can understand how the difficult procedural morass that this proceeding became could make it difficult for BLM to properly execute its administrative duties, this failure cannot be excused. The Committee reviewed all the materials before it, including BLM's submissions, and concluded that the remains were affiliated and should be repatriated to the Tribe. The Committee then forwarded all this information to BLM for its consideration. It was then incumbent upon BLM to reconsider its view on affiliation based on the Tribe's repatriation request, the findings of the Review Committee, and the evidence provided to BLM by the Tribe.[8] While the court has held that the Review Committee's findings are not binding on either BLM or the court, the relevant statutes do make those findings relevant and persuasive, necessitating their review upon a request for repatriation. Accordingly, the court finds that BLM's decision not to repatriate the Spirit Cave Man remains is

arbitrary and capricious and must be vacated.

In its briefing, BLM has made several arguments amounting to a belief that its decision cannot be improper because it has the right to rely on its experts if it so chooses. The court does not quarrel with this statement. *See, Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (providing that when "specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). However, the ability to believe whichever expert BLM chooses to believe, as long as sufficient evidence supports those findings, does not leave BLM free to ignore other competing views by failing to recognize their existence and refusing to describe the reasons why they were not accepted. *See, id.* (noting in the context of supplementing an Environmental Impact Statement that "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."). While BLM's final statement may be a recognition that competing theories exist and that it believes the theory adopted is the more appropriate of the two, this ability to choose between competing theories cannot be used to wholly avoid discussion of that competing theory. Thus, on re-

---

8. The court has held that no review was necessary based on the Review Committee findings only. However, in this analysis the court is considering the fact that the Tribe had made a valid repatriation request. The repatriation request, coupled with the Review Committee findings, the prior evidence submitted by the tribe and the new evidence

submitted by the Tribe at the Review Committee hearing is the basis for BLM's required review. Thus, the court is not contradicting its prior determination when noting that the Review Committee findings were relevant in BLM's need to review the evidence post-hearing based on the Tribe's pending request for repatriation.

mand, BLM is reminded that it must present cogent reasons for its findings, even when it is essentially choosing between two competing theories.

## CONCLUSION

From the information before the court, it is clear that NAGPRA can be a surprisingly difficult statute to implement properly. BLM, charged with making a final determination of affiliation, was faced with a mountain of scientific and cultural evidence on both sides of the issue. It is therefore no surprise that it chose to act cautiously and methodically to reach a final decision on affiliation. However, this process became muddled by the Tribe's request for repatriation. While BLM should have simply made its determination, then moved to considering the Tribe's evidence for repatriation, the two issues blurred.

BLM received the cultural evidence it was supposed to gather in the inventory stage. However, it also received a good deal of scientific evidence which was more appropriately considered at the repatriation request stage. BLM then proceeded to issue its determination report, taking into account some of the scientific evidence while apparently ignoring the rest. The Tribe's repatriation request then became ripe, but BLM felt it had considered the evidence presented by the Tribe. Thus, rather than review its findings based on the Tribe's evidence and request for repatriation, BLM referred the matter to the Review Committee.

Despite this referral, however, BLM adopted the position that the Review Committee's findings were merely advisory and failed to act upon their release. With a repatriation request pending, scientific evidence presented on behalf of the Tribe and specific findings from the Review Committee opposed to BLM's initial determination, some explanation why BLM's initial determination was correct was required. Instead, the issue was passed up the chain of command and lost. The final decision, that no further course of action was available, wholly failed to meet the requirements placed on BLM by NAGPRA's authorization of a repatriation request by the Tribe and the APA's standards for determining whether an agency decision was arbitrary and capricious.

The court finds that BLM made a final agency determination on affiliation in this matter. There is no error, however, in the procedures employed by BLM in making its initial determination of non-affiliation. Instead, the error arose when BLM dismissed the evidence provided by the Tribe in support of its repatriation request, including that evidence which arose through the Review Committee proceedings, without fully explaining the reasons behind its actions. NAGPRA requires BLM to fully and fairly consider this evidence and to uphold or reverse its determination of non-affiliation based on a reasoned and coherent discussion of the evidence and BLM's reasons for believing or disbelieving it. This discussion never occurred, necessitating a finding that BLM's determination was arbitrary and capricious.

The court notes, however, that this order does not determine that BLM's initial determination of non-affiliation is wrong and should not be read to mandate a finding of affiliation by BLM. The issues surrounding the age of the remains and the competing theories of population migration in the area make BLM's determination difficult to reach at best. Further, the *Bonnichsen* cases and their impact on defining historical remains as Native American make BLM's job that much more difficult. The order merely states that BLM was presented with a valid repatriation request and a significant amount of scientific and cultural evidence, as well as specific

findings by the Review Committee, that required BLM to do more than simply state that the evidence had been reviewed and no further action was available at the time. BLM needs to compare its findings with the evidence and explain why its determination is, or is not, still the most correct finding available.

It is therefore ORDERED that the Tribe's Motion for Summary Judgment (# 31) is GRANTED in part as set forth herein;

It is further ORDERED that BLM's Cross–Motion for Summary Judgment (# 44) is DENIED;

The *amicus* briefs filed in this matter (# 35, 37, 38, 39, 40 & 50) have been considered by the court in reaching its decision.

The matter is remanded to BLM for further proceedings consistent with this ORDER.

The Clerk shall enter judgment accordingly.